**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 05-1810**

JOHN E. WASHINGTON,

Plaintiff - Appellant,

versus

CITY OF CHARLOTTE,

Defendant - Appellee.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. David C. Keesler, Magistrate Judge. (CA-02-534-3)

Argued: September 18, 2006          Decided: February 2, 2007

Before KING, GREGORY, and SHEDD, Circuit Judges.

Affirmed by unpublished per curiam opinion. Judge Gregory wrote a dissenting opinion.

U. Wilfred Nwauwa, Charlotte, North Carolina, for Appellant. Richard Harcourt Fulton, OFFICE OF THE CITY ATTORNEY, Charlotte, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

John E. Washington appeals from the district court's award of summary judgment in favor of the City of Charlotte (the "City") in Washington's employment discrimination suit. Washington initiated this action in the Western District of North Carolina on December 23, 2002, alleging that the City had contravened Title VII by terminating him because he is African-American. Washington contends that the court erred in its seventeen-page summary judgment Order of June 14, 2005, in which it concluded that he had raised no genuine issues of material fact. See Order, Washington v. City of Charlotte, No. 3:02-cv-00534 (W.D.N.C. June 14, 2005) (the "Opinion"). More specifically, Washington maintains that he presented a genuine factual issue as to whether the City had failed to terminate white employees who engaged in conduct similar to his own. As explained below, we affirm.[1]

---

[1]In addition to Washington's assertion of a genuine question as to whether he was treated worse than white employees in similar circumstances, he maintains that there were two other genuine issues of material fact: whether the City proffered legitimate, nondiscriminatory reasons for his termination, and whether the City's proffered reasons for his termination were pretextual. Because we find no merit in Washington's first contention, we conclude that he failed to establish a prima facie case of a discriminatory termination, and we do not reach or address his latter two assignments of error.

I.

On April 24, 2001, Washington was terminated from his position with the City's Aviation Department (the "Department"), where he had worked as a Labor Crew Chief at Charlotte Douglas International Airport.[2] According to his notice of termination, Washington was fired for improperly appropriating City-owned landscaping stone for personal use and engaging in conduct toward a non-supervisory employee that was unbefitting a supervisor. The notice of termination informed Washington that, in appropriating the stone, he had violated Department policy on the use of City property, as well as the general standards of conduct applicable to all City employees. Washington admitted that he had taken the stone (using a City-owned tractor to load it into his truck), and that he had been involved in an argument with a non-supervisory employee.

Despite his admissions, Washington protested his firing in an internal grievance, which he filed on May 7, 2001, asserting that white supervisors had previously stolen from the Department or committed more serious infractions, yet not been terminated. As pertinent here, Washington alleged that a white supervisor named Mike Arnold, who operated a landscaping business in addition to having a separate job with the City, had previously appropriated

---

[2]The factual predicate of this appeal is taken from the record below. We construe the evidence and draw all reasonable factual inferences in the light most favorable to Washington. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

trees delivered to the City at the Airport and used them in his landscaping business. Washington also alleged that a white supervisor named Elmo Langley "was not terminated for his incident," and that another white supervisor named Terry Summerville "took copper to Tennessee during regular work hours but was not terminated." J.A. 334.[3] Washington did not elaborate on either of the latter two allegations.

In its response to Washington's grievance, issued on May 30, 2001, the Department concluded that any trees Arnold had ordered from the City's vendor for use in his landscaping business had been ordered in Arnold's own name and paid for by him. The Department also responded that the allegations made against Langley and Summerville had been investigated and resolved in accordance with applicable City policy, but that information from those individuals' personnel files could not be released in response to Washington's grievance. Finding that Washington's termination had been appropriate, the Department denied his grievance. Washington appealed the Department's ruling on the grievance to the City, which, on January 24, 2002, upheld the denial.

On May 15, 2001, shortly after filing his grievance, Washington also filed a Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC"). The EEOC

---

[3]Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

investigated Washington's allegations and, on September 20, 2002, issued Washington a right-to-sue letter, clearing the way for him to pursue his claim in court.

On December 23, 2002, Washington filed his Complaint in this matter, alleging that the City had contravened Title VII by, inter alia, "terminating plaintiff when other employees of a different race accused or known to have violated the same or more egregious defendant policy [sic] were not terminated." Complaint 2 (J.A. 5). In discovery, Washington deposed Jerry Orr, the Department Director, regarding Arnold's purchase of trees from the vendor used by the Department. Orr testified that Arnold had, with the permission and oversight of his supervisor, occasionally ordered trees for his personal business and paid for them himself. Orr stated that Arnold did not order trees on the City's account or appropriate a discount meant for the City. Washington elicited no admissible evidence to the contrary.

Washington did not seek any discovery relating specifically to either Summerville or Langley. In his interrogatories, however, he requested information concerning any other employee misconduct "involving the taking or misusing of City property." J.A. 443. The City's response identified four instances of such misconduct, describing them in general terms and withholding the names of the employees involved. The City advised that it was "prohibited from releasing information from personnel files of employees, except as

5

provided by NCGS § 160A-168." Id. at 444. That notice reiterated the City's disclosure to Washington, made at the outset of discovery, that employee personnel files "may be subject to various applicable statutory protections and privacy issues, including but not limited to NCGS § 160A-168, and it may be necessary to obtain a Court Order to utilize these materials." Id. at 22 (City's Rule 26 disclosures). Washington did not pursue any such court orders.

On July 30, 2004, after discovery had been completed, the City moved for summary judgment, pursuant to Rule 56(b), contending that Washington had failed to forecast sufficient evidence for a rational trier of fact to find that the Department had retained white supervisors whose conduct was similar to his. The district court granted summary judgment to the City by its Opinion of June 14, 2005.

Washington has appealed the district court's award of summary judgment on his Title VII claim, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

II.

We review de novo a district court's award of summary judgment. Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 958 (4th Cir. 1996). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine

6

issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We construe the evidence and draw all reasonable factual inferences in the light most favorable to the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

III.

Washington contends that the district court erred in granting summary judgment to the City because he raised a genuine issue of material fact on whether the Department had failed to terminate white supervisors who engaged in conduct similar to his. We find no merit in this assignment of error, however, because Washington did not proffer evidence sufficient for a rational trier of fact to find in his favor.

Washington sought to establish his Title VII claim under the familiar McDonnell Douglas burden-shifting framework. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Pursuant thereto, he bore the initial burden of establishing a prima facie case of racial discrimination. See id. at 802. If he had done so, the burden would have shifted to the City to articulate some legitimate, nondiscriminatory reason for his termination. See id. And, if the City had then carried its burden, Washington would have been obliged to show that the City's proffered nondiscriminatory

7

reason was pretextual.  See id. at 804; see also Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996).

To satisfy the first step in the McDonnell Douglas framework — the prima facie showing — Washington was required to demonstrate that (1) he is a member of a protected class; (2) he was qualified for his job and his job performance was satisfactory; (3) he was fired; and (4) other employees who were not members of the protected class were retained under similar circumstances.  See Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir. 1995); see also McDonnell Douglas, 411 U.S. at 802 & n. 13; Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir. 1993).  The City concedes that Washington established the first three of these four prongs.  On the fourth, however, the district court concluded that Washington had failed to raise a genuine question of fact, and that, as a result, he was unable to make a prima facie showing of a racially discriminatory termination.  Opinion 17.

Washington disputes the district court's conclusion, relying on his allegations that white supervisors Arnold and Summerville had contravened the Department's policy on the use of City property but were not fired.[4]  Unfortunately, Washington's assertions are

---

[4]In seeking to properly support his disparate treatment claim, Washington also submitted affidavits from two coworkers alleging that Arnold had engaged in misconduct other than the theft of City property:  directing subordinates to perform work for his personal benefit while on City time.  Washington did not, however, forecast evidence that would sustain a finding that management had been made aware of such allegations, and thus failed to link them to his

8

not supported by the record. It is well established that a summary judgment motion cannot be successfully opposed by unsubstantiated allegations; rather, the non-moving party is obliged to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (quoting Rule 56(c)). On this record, as the court ruled, Washington failed to satisfy that burden. With regard to Arnold's alleged misconduct, the only evidence of record cognizable under Rule 56(c) is Department Director Orr's deposition testimony. Orr testified that Arnold sometimes ordered trees from the City's vendor, but did so in his own name, with his own money, and with the permission and oversight of his supervisor. J.A. 257, 273. That evidence, of course, contradicts Washington's allegations.

Washington alleges that Arnold actually ordered the trees for his personal business using the City's account, and without his supervisor's permission. His sole evidence on this point, however, is a document of unknown authorship, purporting to summarize an interview with Don Hicks, Arnold's supervisor. See J.A. 428. (Washington maintains that the document was prepared in the course of the EEOC investigation.) In addition to being anonymous, of course, this document is unsworn. And it is clear that unsworn,

disparate treatment claim.

9

unauthenticated documents — let alone anonymous ones — cannot be considered in connection with a motion for summary judgment. Orsi v. Kirkwood, 999 F.2d 86, 92 (4th Cir. 1993). Washington's contention regarding Arnold is thus supported by bare allegations only, which are directly contradicted by Orr's deposition testimony. Such allegations do not constitute evidence from which a reasonable trier of fact could find in Washington's favor.

Washington's allegations regarding Summerville likewise lack evidentiary support. Washington asserts, however, that this absence of evidence is due to the City's refusal to release information from Summerville's personnel file. During discovery, the City explained to Washington that employee personnel files are protected from disclosure by N.C. Gen. Stat. § 160A-168, and that "it may be necessary to obtain a Court Order to utilize these materials." J.A. 22 (City's Rule 26 disclosures); see also J.A. 444 (City's response to Washington's interrogatories). As the City points out, the pertinent statutory provision generally prohibits the disclosure of information from the personnel file of a city employee. See N.C. Gen. Stat. § 160A-168(c). Such information may be disclosed, however, as the statute specifies, upon order of a court of competent jurisdiction. See id. § 160A-168(c)(4). Washington does not assert that he ever sought such an order, even though the City expressly advised him of his need to do so.

10

Consequently, there is no evidence of record supporting Washington's allegation regarding Summerville.

In these circumstances, the district court correctly concluded that Washington was unable to show any genuine factual question as to whether white supervisors had been retained by the City under circumstances similar to his. <u>See</u> Opinion 17. Washington thus failed to establish a prima facie case of a discriminatory termination under Title VII, and the court properly awarded summary judgment to the City. <u>See</u> <u>Bryant v. Bell Atl. Md., Inc.</u>, 288 F.3d 124, 135 (4th Cir. 2002) (affirming summary judgment against Title VII plaintiff because he failed to establish prima facie case).

IV.

Pursuant to the foregoing, we reject Washington's contention of error and affirm the district court's award of summary judgment to the City.

<u>AFFIRMED</u>

GREGORY, Circuit Judge, dissenting:

Contrary to the majority, I believe that the evidence, when viewed, as it must be, in the light most favorable to the plaintiff, is sufficient to create a genuine issue of material fact as to whether the City of Charlotte ("the City") failed to terminate white supervisors similarly situated to John E. Washington ("Washington"). I also believe that the evidence, again viewed in the light most favorable to the plaintiff, is sufficient to show that the City's proffered reasons for firing Washington were pretext for discrimination. Accordingly, I respectfully dissent.

I.

Following are the facts set forth in the light most favorable to Washington, the non-movant in the summary judgment proceedings below. Washington, an African American, was employed for nearly seventeen years with the City. He began his employment in 1984 as a temporary sanitation worker. He soon transferred to the City's Aviation Department ("the Department") as an airport shuttle bus operator and eventually worked his way up to the supervisory position of labor crew chief in the Department's field maintenance unit.

Washington testified that he was not permitted to supervise white employees in the same manner as he supervised black

12

employees. He was once called to the Human Resources Department, for example, because he gave a white subordinate a "meet basic" rating. The human resources office forced Washington to provide paperwork justifying his rating, and the white employee was later moved to a work crew with a white supervisor. Although Washington had given that same rating to black subordinates many times, he had never been summoned by the human resources office and made to explain his evaluation.

Washington further testified that his supervisor Don Hicks ("Hicks"), who is black, was not supportive when Washington tried to discipline white employees. When Washington complained to Hicks about white employees' misconduct, nothing happened. Washington believed that Hicks "was put there to keep people from saying discrimination." J.A. 64. In addition, according to Washington, Hicks began his meetings by announcing that he was "the head nigger in charge." J.A. 65.

On April 21, 2001, Washington and Jeff Tucker ("Tucker"), a white employee who worked in the landscaping unit, had a verbal exchange, the end of which Hicks witnessed. When Hicks called the men into his office to discuss the matter, Washington told Hicks that the exchange was about Tucker's threat to disclose that Washington had taken some brick pavers for personal use. Washington then admitted that he had taken some brick pavers, valued at fifteen dollars. Hicks reported the incident to the

13

Human Resources Department, after which Washington was terminated for (1) violating a policy that prohibits the personal use of City property, regardless of value, and (2) exhibiting "conduct towards a non-supervisory employee [that] was unbefitting a supervisor and interpreted as intimidating and a misuse of authority." J.A. 331.

Washington filed a grievance with the City Human Resources Department, claiming that white employees had taken City property without being fired and denying that he threatened Tucker. Washington wrote (and later testified) that Hicks was aware of the "common practice for employees to take stones, pavers, or other supplies," told Washington that he could take pavers when no one was around, and failed to stop Washington when Hicks saw him headed toward home with a load of stones. J.A. 333. Washington also cited several examples of white supervisors being given more freedom than black supervisors to take City property, make personal use of City equipment, and participate in hiring selection. Among other names, Washington mentioned Mike Arnold ("Arnold"), a white supervisor responsible for ordering supplies for the City. According to Washington, Arnold ordered extra supplies for his home and used the labor of other employees to complete tasks at the airport for his personal business. Washington concluded the grievance by observing that white employees who committed infractions similar to his were rarely disciplined, much less terminated.

14

The City determined that there was no disparate treatment and sustained Washington's dismissal. He subsequently filed a charge of racial discrimination with the Equal Employment Opportunity Commission ("EEOC"). Thereafter, he filed suit in federal district court where the magistrate judge, exercising jurisdiction with the parties' consent, granted summary judgment in favor of the City. This appeal followed.

## II.

As the majority has explained, Washington has chosen to avail himself of the familiar burden-shifting framework announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this framework, in order to establish a prima facie case of discrimination in the enforcement of employee disciplinary measures, the plaintiff must show that (1) he is a member of a protected group; (2) he was qualified for his job and his performance was satisfactory; (3) he was terminated; and (4) other employees who were not members of the protected group were retained under apparently similar circumstances. Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 133 (4th Cir. 2002).

If the plaintiff sets forth a prima facie case, the defendant must rebut the presumption of discrimination established by the prima facie case by advancing a legitimate, nondiscriminatory reason for the employment decision. The plaintiff must then

15

demonstrate that the defendant's proffered reason is mere pretext for discrimination. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255-56 (1981). The plaintiff may do this by showing that the proffered reason is false: "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000). Indeed, "once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." Id.

## III.

It is undisputed that Washington is a member of a protected group, was qualified for his job and had been performing satisfactorily,[1] and was terminated. The majority has concluded that Washington cannot, however, satisfy the fourth element of his prima facie case. In other words, he has not shown an issue of fact as to whether the City retained white supervisors under circumstances similar to his. In my view, not only has Washington

---

[1]On performance reviews completed between 1997 and 2000, Hicks consistently gave Washington a "G" rating, indicating that Washington had met, and periodically exceeded, the requirements of his position. There is no evidence that Washington had any previous infractions or disciplinary problems.

16

made out all four elements of his prima facie case, he has also demonstrated an issue of material fact as to whether the City's stated reasons for terminating him are pretext for discrimination.

A.

According to the majority, the record does not support Washington's allegation that a white supervisor, Arnold, contravened the Department's policy on the use of City property but was not fired.  In reaching this conclusion, the majority limits its analysis to the issue of whether, and to what degree, Arnold used the City account to order trees for his personal use.  The only evidence regarding this alleged misconduct, the majority notes, is the deposition testimony of Jerry Orr ("Orr"), Director of the Aviation Department, which contradicts Washington's allegations.

In my view, Arnold is in fact similarly situated to Washington (in that Arnold violated Department policy), but not because of the alleged misconduct that the majority discusses.  Rather, the record supports Washington's allegation that Arnold used City supplies, equipment, and labor for his personal gain, unrelated to or notwithstanding his use of the City account to order trees.  The affidavits of Shawn Jordans ("Jordans") and Luke Berry ("Berry"),

17

which the majority briefly references in a footnote, attest to this fact.[2]

The first affiant, Jordans, worked for Arnold in the Department's landscaping unit. Jordans testified that one of Arnold's assistant supervisors "personally ordered" him "to fill [Arnold's] personal truck with mulch." J.A. 433. Jordans refused, he recalled, "because [he] did not want to take part in stealing." Id. He was then "written up" by Arnold for insubordination. Id. He did not report the matter to Hicks, Arnold's supervisor, for fear of losing his job: He "personally knew and it was also . . . general knowledge that Don Hicks, the manager, would side with Mike Arnold, whether or not Mike Arnold did right or wrong." J.A. 433-34. Jordans further testified:

> I personally knew and it was not a secret that Mike Arnold was using certain of the landscaping crew members to perform his landscaping business on the City time. Todd McCall was openly bragging to me how he was getting paid twice, one from the City and another from Mike Arnold for the side landscaping job he performed for Mike Arnold. Todd McCall's own words were "you can't beat that."

J.A. 434.

The second affiant, Berry, worked in the landscaping unit under Arnold's supervision before transferring to the field maintenance unit under Washington's supervision. Berry testified, "I personally know that Mike Arnold was doing his landscaping

---

[2]The magistrate judge considered both affidavits in deciding the motion for summary judgment.

business on the City time because Mike Arnold . . . had me cut grass for him at West Boulevard on City time and he was paid for the job . . . ."  J.A. 436.

These affidavits, made on personal knowledge, see Fed. R. Civ. P. 56(e), unambiguously support Washington's allegations that white supervisors (or Arnold, in very the least) contravened Department policy without being disciplined.  The policy states that "[t]he use of City vehicles, equipment, supplies and property is for official City or Aviation Department work only and is strictly forbidden to be used for personal gain."  J.A. 346.  Moreover, Orr, on whose deposition testimony the majority relies, clarified what his Department would consider a violation of the policy.  When asked whether employees' use of airport supplies in running their side businesses would be a violation of Department policy, Orr answered yes.  J.A. 247.  When discussing Arnold's practice of ordering trees for personal use at the same time he ordered trees for the City and having both sets of trees delivered to the airport, Orr stated that "[i]t would not be a violation of [the policy] if [Arnold] ordered something for his personal use, paid for it for his personal use, and didn't—didn't use City equipment in the process."  J.A. 251.  Orr did not "see any conflict of interest as long as [there is] a separation, as long as [an employee] doesn't use City equipment in the process."  J.A. 253.

19

Finally, Orr testified that the use of City crew on City time for non-City tasks would violate the rules. J.A. 254.

Orr's testimony, if not the letter of the policy alone, makes clear that using City equipment, City supplies, City time, or City labor for personal gain constitutes a violation of the Department's policy. The affidavits of Jordans and Berry, then, create a factual issue as to whether Arnold used City supplies (i.e., mulch), labor (i.e., the landscaping crew), and time (i.e., to cut grass and perform other landscaping jobs for private clients) in contravention of this policy. It was error for the magistrate judge, fully aware of the affiants' statements, to contradict that which the Department representative himself stated was Department policy, to ignore the breadth of Washington, Jordans, and Berry's allegations by concentrating only on the issue of whether Arnold impermissibly used the City account, and to find that "it is impossible to conclude that Mr. Arnold misappropriated City property." J.A. 485.

The magistrate judge also surmised that, even if Arnold violated Department policy, perhaps Hicks and his immediate supervisor, George Robinette ("Robinette"), did not know and therefore should not be liable for failing to take action. The majority adopts this view as well. We can infer from the circumstantial evidence in the record, however, that Arnold's superiors had some knowledge about his activities yet failed to

20

discipline him. As Jordans testified, "it was not a secret" that Arnold used the City crew to perform his side jobs on City time. J.A. 434. Likewise, Jordans testified that Hicks's unfailing support of Arnold's activities, both right and wrong, was general knowledge. This testimony corroborates Washington's allegations about Hicks's support of Arnold and Hicks's refusal to act on Arnold's misappropriation of City property. We may also infer from the fact, as described by Jordans and Berry, that Arnold had subordinates participate in his misappropriation of City property, that his activities were widely known. Finally, Orr testified that he knew Arnold had trees ordered for personal use delivered to the airport. Despite Orr's denials (discussed below), we may infer from this knowledge that Arnold's superiors knew, at some point, that Arnold would need City equipment or labor to assist him in handling those trees.

Orr's testimony, on which the majority rests its entire analysis regarding Arnold's misconduct, in fact creates a genuine issue as to whether Arnold used City equipment and labor in handling the trees delivered to him at the airport. These trees, even if paid for by Arnold for his personal use, did not exit the delivery truck without assistance. When asked whether Arnold used the City crew to load the trees onto Arnold's personal truck, Orr initially answered no, but admitted shortly thereafter that he does not know, as he has 250 employees and simply trusts supervisors to

"know the rules, and . . . do what they're supposed to do."  J.A. 254.  Orr did not know precisely how trees delivered to Arnold at the airport got off of the delivery truck—that is, whether they were loaded directly into Arnold's truck or deposited on the ground first.  Nor could Orr confirm that none of the items delivered to the airport in Arnold's name actually belonged to the City. Indeed, Arnold's duties included both ordering supplies for the City and accounting for the items' actual delivery and usage.  Of this system with minimal oversight for Arnold's actions, Orr conceded, "if the information [is] tainted at the input level, it would be tainted at the output level."  J.A. 250.[3]

Orr supplied a single reason for his firm belief that Arnold never misappropriated City property or City time.  According to Orr, Hicks and Robinette investigated allegations of Arnold's misconduct and determined that the allegations lacked merit.  Orr could not recall any details of the investigation, but maintained that "[Hicks and Robinette's] explanation was satisfactory at the time."  J.A. 248.  Thus, Orr derived his confidence in Arnold's

---

[3]Jordans, meanwhile, testified:
> I personally know that when supplies, such as trees, shrubs and flowers arrives [sic] from the suppliers, no separations were made as to the City owned and personally owned, but I noticed that next morning [sic], half of the supplies would be gone and the backhoe would be gone as well, and yet not [sic] city job was done with the supplies.

J.A. 433.

22

conformity with the rules from a hazily recalled investigation in which Hicks was involved and about which Orr lacks personal knowledge.  The majority would seem to find Orr's testimony about the "investigation" admissible, and would seem to consider the testimony support for the ultimate proposition that no rational finder of fact could conclude that Arnold misappropriated City property.  I cannot agree with this.  Quite tellingly, the one person who is knowledgeable about whether Arnold's activities conformed with Department policy, Hicks, has not testified in this matter.  Without Hicks's testimony, the record is bereft of evidence that Hicks or anyone else had personal knowledge that Arnold's practices did not violate Department policy.[4]

In sum, because the record contains evidence that Arnold used City supplies, equipment, labor, and time for personal gain, in violation of Department policy, Washington has created a genuine issue as to whether the City retained similarly situated white supervisors but not him.  He has therefore made out a prima facie case of discrimination.

---

[4]I agree with my good colleagues that, in deciding a motion for summary judgment, this Court should not consider unsworn, unauthenticated documents such as the document Washington maintains is a summary of the EEOC's interview with Hicks.

23

B.

Having found the opposite, the majority does not reach the issue of pretext. I, however, believe that the evidence of record (and, in some instances, the lack of evidence) supports a showing by Washington that the City's proffered reasons for his termination are mere pretext for discrimination.

Washington has presented sufficient evidence at this stage for a rational jury to conclude that the City's first reason for his termination, his theft of fifteen dollars' worth of brick pavers, is unworthy of credence. Cf. Burdine, 450 U.S. at 256. Among other things, Washington's and Jordans's testimony indicates that Hicks turned a blind eye to Arnold's misdeeds; their testimony and Berry's testimony establish an atmosphere that, contrary to what Washington's swift termination suggests, tolerated and even encouraged employees' personal use of City property; and the recommendation to terminate Washington came from Hicks who, along with Arnold, the record shows, consistently dismissed each of Washington's many complaints about the workplace.

There is simply no evidence to support the City's second reason for terminating Washington. First, Washington denied threatening or intimidating Tucker. Washington described their

24

"verbal confrontation," J.A. 97, at his deposition.  The account is the only description of the exchange in the record:[5]

> I guess it was Monday, when I came in.  My crew was out on the expressway picking up.  I had to go back for something.  And as I went to pull in, Jeff Tucker was coming out and–
>
> . . .
>
> And I said, let me speak to you for a minute, you know. I was just like that, let me speak to you for a minute.  [Tucker replied] No! No! I ain't whatever, or something, you know, whatever.
>
> And then I said, okay. I said, okay, from now on you do like the rest of them.  If you've got something to say, just say it behind my back and leave me alone.
>
> Okay, he was walking on past.  And then he came back to my truck.  I guess he seen that I wasn't going to fall into a trap, or something.  He came back to my truck, where I was in the door, and then he started an argument with me.
>
> Then I was still in the door, mind you, or whatever, and then he said something about telling [Hicks].  And I said, well, tell [Hicks].
>
> And we proceeded to go up the steps, and stuff like, and that is when [Hicks] told me to stay in the lobby upstairs, and he took [Tucker] down to his office.  And I was waiting.

J.A. 89-90.

---

[5]Again, I agree with my good colleagues that we cannot consider the anonymous, unsworn, unauthenticated summary of the EEOC's interview with Hicks, during which Hicks is supposed to have said that he did not witness any confrontation between Washington and Tucker, but heard from his secretary that the men, as the author of the summary phrased it, "were arguing and about to fight."  J.A. 500.

Washington testified that he never threatened anyone he worked with, much less a subordinate or Tucker, who did not report to Washington. Washington also noted that Tucker has a six-foot-one, four hundred-pound frame that exceeds Washington's five-foot-eleven, admittedly "oversized" frame, and that he would not have threatened Tucker because he knew he "[wasn't] going to win" a workplace altercation with a white employee given what he perceived as the bias in favor of white employees in his workplace. J.A. 98. Importantly, no evidence of record contradicts Washington's denial.

Second, Tucker never said that Washington threatened or intimidated him. The City has not pointed to any such statement, or reference to such statement, in the record. To the contrary, the record contains evidence that <u>Tucker</u> was the workplace bully, not Washington. The record contains Berry's testimony that Tucker harassed and threatened him, and Washington's written complaints to management about Tucker's abuse of employees.

Third, Hicks, who reported Washington's alleged misuse of authority to the Human Resources Department, saw only a portion of the verbal exchange and merely observed that Washington "was doing most of the talking." J.A. 349. How, on this record, the mere act of getting into an argument or, worse, simply "doing most of the talking" in an exchange translates into affirmative evidence that a supervisor abused his authority and exhibited conduct

26

interpreted[6] as intimidating escapes me. In drawing this conclusion, the magistrate judge failed to view the evidence in the light most favorable to Washington and, therefore, did not properly consider the inferences that could lead a reasonable jury to find that the City's justification for terminating Washington was pretext for racial discrimination. The majority errs in leaving the magistrate judge's conclusion undisturbed.

## IV.

On motion for summary judgment, we must construe the evidence and draw all reasonable factual inferences in the light most favorable to the non-movant. It is difficult, if not impossible, to follow this mandate without considering the affidavits of Jordans and Berry and the fact that the City has yet to establish the charge that Washington intimidated an employee. Relying only on the testimony of Orr, who had no personal knowledge of the events in question and whose testimony cannot overcome the absence of testimony by Hicks, compounds this problem.

Washington has presented sufficient evidence, when viewed in the light most favorable to him, to satisfy the fourth element of his prima facie case (which is not an "onerous" burden, see Burdine, 450 U.S. at 253) and to permit a reasonable trier of fact

---

[6]By whom, one might ask, as the record is also unclear as to who interpreted Washington's discourse as intimidating.

27

to conclude that the City's stated reasons for terminating him are pretext for racial discrimination.  For this reason, I respectfully dissent.